# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### MAY SESSION, 1998

FILED

March 25, 1999

Cecil W. Crowson
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | |
| | ) | No. 01C01-9704-CC-00143 |
| Appellee | ) | |
| | ) | WARREN COUNTY |
| vs. | ) | |
| | ) | Hon. Charles Haston, Judge |
| JENNIE BAIN DUCKER, | ) | |
| | ) | (Aggravated Child Abuse, |
| Appellant | ) | Two Counts) |

For the Appellant:

**David L. Raybin**
Hollins, Wagster & Yarbrough
2210 SunTrust Center
424 Church Street
Nashville, TN  37219

and

**Michael D. Galligan**
308 West Main Street
P. O. Box 289
McMinnville, TN  37110-0289

For the Appellee:

**John Knox Walkup**
Attorney General and Reporter

**Sandy C. Patrick**
Assistant Attorney General
Criminal Justice Division
450 James Robertson Parkway
Nashville, TN 37243-0493

**William M. Locke**
District Attorney General
P. O. Box 410, Professional Bldg.
McMinnville, TN  37110

OPINION FILED: _____

AFFIRMED

**David G. Hayes**
Judge

The appellant, Jennie Bain Ducker, was indicted in June, 1995, on two counts of first degree murder resulting from the aggravated child abuse of her two children, ages 13 months and 23 months. A Warren County jury, on October 3, 1995, found the appellant guilty of two counts of the lesser charged offense of aggravated child abuse. Concurrent sentences of eighteen years were imposed for each of the class A felony convictions. In this appeal as of right, the appellant raises the following issues:

I. Whether the trial court erred in denying the appellant's motions to suppress: (1) her statement to law enforcement officials, (2) the results of her blood alcohol test, and (3) the results of the search of her vehicle (appellant's issues VI, VII, VIII, IX);

II. Whether the crimes of Child Abuse, Tenn. Code Ann. § 39-15-401(1994 Supp.) and Aggravated Child Abuse, Tenn. Code Ann. § 39-15-402 (1994 Supp.), are unconstitutionally void for vagueness (appellant's issue V);

III. Whether the evidence is insufficient to support convictions for two counts of aggravated child abuse because the trial court failed to properly instruct the jury as to the definition of "knowingly" (appellant's issues I & IV);

IV. Whether aggravated child abuse is a lesser included offense of first degree murder (appellant's issue II);

V. Whether the trial court erred in admitting evidence that Micah Majors had previously engaged in sexual relations with the appellant (appellant's issue X);

VI. Whether the trial court erred by permitting the prosecution to erroneously argue facts that were not in evidence (appellant's issue XI);

VII. Whether the trial court erred by permitting the prosecution to cross-examine the appellant regarding prior bad acts, and, subsequently, by permitting the prosecution to introduce rebuttal testimony concerning these prior bad acts (appellant's issue XII);

VIII. Whether the introduction of testimony and the State's argument regarding the appellant's sexual relationship with Mr. Majors and prior bad acts of the appellant constituted cumulative error (appellant's issue XIII); and

IX. Whether the trial court erred by imposing class A felony sentences for the appellant's convictions for aggravated child abuse since the jury was only instructed as to the class B version of the offense (appellant's issue III).

After a review of the record and the applicable law, we affirm the judgment of the trial court.

**Background**

The events leading to the tragic deaths of thirteen month old Dustin Ducker and twenty-three month old Devin Ducker began in the early evening hours of June 5, 1995. At around 6:30 p.m., the appellant, the twenty year old mother of the victims, arrived with her two children at the home of her boyfriend, Jimmy Turner. Although married, the appellant was estranged from her husband. She spent the evening cleaning Turner's home and playing with her two children. Around 10:30 p.m., Turner retired to his bedroom accompanied by his own small child, while the appellant and her two children continued to play video games. Sometime during the early morning hours, the appellant and her children left Turner's residence.

McMinnville Police Officer Alan Dalton testified that he was on duty during the early morning hours of June 6, 1995. He stated that it had been raining "on and off" throughout the night and it was "real foggy." Around 3:30 a.m., Officer Dalton, while patrolling Old Smithville Highway, observed a white vehicle with dark tinted windows traveling in the northbound lane. The white vehicle pulled into the Pioneer Service Station, made a U-turn, and headed southbound toward town. Because of the time of night, Officer Dalton followed the vehicle. The vehicle pulled into a driveway in a residential area. The residence was later determined to be a vacant house owned by the appellant's grandmother. The appellant got out of her vehicle and began waving something at Officer Dalton. Dalton parked his patrol car and was confronted by the appellant. She asked him if he had stopped her because of her tinted windows. The appellant explained that she had been cited earlier for tinted windows and speeding. After discussing the appellant's particular concerns about these violations, Officer Dalton asked her what she was doing out so late at night.

3

The appellant answered that she and her boyfriend were having problems. The appellant did not appear intoxicated and spoke "intelligently." Officer Dalton testified that he could not see whether other persons were in the appellant's vehicle due to the tinted windows.

At approximately 3:45 a.m., the appellant arrived at Room 222 of the Holiday Inn in McMinnville. This was the temporary residence of Micah Majors, another boyfriend of the appellant. With the children securely strapped in their car seats, the appellant closed the windows and locked the doors. Brad Pepper, Matt Holder, and Buddy Majors were already in the room with Micah when the appellant arrived.[1] The four men were playing a Sega video golf game and drinking alcoholic beverages. The men continued to play their video game, paying little or no attention to the appellant. They did notice, however, that the appellant poured herself a glass of wine. Additionally, they observed her leave the room on two occasions, once to get ice and once to get BC powders from Micah's car. The appellant never mentioned that her children were in her car or that she needed to check on the children. All four men testified that, despite her usual "dingy" attitude, the appellant did not appear intoxicated.

Pepper, Holder, and Buddy Majors left Micah's room around 5:00 a.m. The appellant followed the three men to the parking lot, but never checked on her children. As they were pulling out of the parking lot, Pepper noticed that the appellant was already back on the second floor balcony near Micah's room.

When the others left his room, Micah had changed into boxer shorts and gotten into bed. The appellant knocked on his door and he let her back in the room. Micah testified that he was trying to go to sleep, but the appellant sat next to him on

---

[1]The appellant met the four young men while she was employed at Calsonic. The men worked second shift, 3:00 p.m. to midnight, and were accustomed to socializing after work. The appellant was terminated from Calsonic on February 20, 1995, after being late for work on several occasions. While employed at Calsonic, she also worked second shift.

4

the bed trying to talk to him about a "commitment" in their relationship. Micah then fell asleep. When his alarm went off the next afternoon around twelve or one o'clock, the appellant was still there. She patted Micah on the side of the leg and said, "I have to go." She never mentioned her children.

At 1:03 p.m., the appellant arrived at the emergency room of the River Park Hospital in McMinnville. While she was attempting to get one child out of the car, David Smith, a bystander, heard her say, "Somebody help me. My babies have been in the car for four hours." He responded to her plea for assistance. When he reached the appellant, he observed that the child she was carrying appeared lifeless. The appellant told Smith that she had been shopping. Susan Smith, David Smith's wife, tried to comfort the appellant, who was not crying at that time. The appellant informed Lois Argo, a nurse's assistant, that she thought that the child was dehydrated. Geraldine Fults, a registered nurse, also met the appellant as she entered the emergency room. Fults noticed that both children were not exhibiting any signs of life. The appellant told Fults that the children had been left in a car for three hours with the windows closed. She explained that she had fallen asleep at a friend's house on Lucky Road. At this point, the appellant became frantic, "she was pacing the floor," "wringing her hands," "running her hands through her hair."

Alan Cleek, the Director of Psychiatric Services, was directed to the emergency room where he met the appellant, who was sitting in the waiting area sobbing and wringing her hands. Cleek escorted the appellant to the physicians' lounge, where she could have some privacy. Cleek asked the appellant what had happened and she responded that she had fallen asleep. Cleek then asked her how he could get in touch with her family. The appellant would not respond and just shook her head. Jeanine Ritchey, a registered nurse, was also in the lounge when Doctors Bigbee and Snyder entered and informed the appellant that the two children were dead. Ritchey testified that the appellant was in a "balled position," her eyes

5

were not focused and her hair was disheveled. The appellant started moaning, stating "This can't be happening." Shortly thereafter, law enforcement investigators arrived. Cleek informed the officers that the appellant was too upset to talk and that she needed sedation. He testified that, although he did not remain in the lounge for the duration of the questioning, he felt that the appellant did not wish to speak with law enforcement officials.

After being advised of the situation, TBI Special Agent Mark Gwyn was requested to accompany the district attorney to the hospital. When Agent Gwyn arrived at the hospital, he noticed the appellant's white Cutlass parked in front of the emergency room. As he entered the emergency room, Chief Investigator Herb Rowland informed him that the appellant had brought the children to the hospital. Rowland also informed him that the appellant was in the physicians' lounge. Gwyn, accompanied by Assistant District Attorney Larry Ross, interviewed the appellant in the lounge. Gwyn testified that, at this point, all questioning was just of an investigatory nature, because it was unknown as to whether a crime had been committed. He explained to the appellant that she was not under arrest and that she was free to go at any time. He informed the appellant that he was just trying to find out the facts surrounding the death of the children. Gwyn stated that at no time was the appellant threatened or coerced into providing a statement. The appellant agreed to talk with Gwyn and she appeared to comprehend what was being said. She also instructed Gwyn that she did not want any of her family members in the room.

Although the appellant appeared distraught, when posed a question by Gwyn, the appellant would reflect upon her answer before responding. The appellant told Agent Gwyn that she had spent the night with her boyfriend, Jimmy Turner. She had been up until around 3:00 or 4:00 a.m. playing Nintendo. During this time, the appellant had one glass of wine. Around 4:00 a.m., she went to bed

and slept a couple of hours. At 8:00 a.m., the appellant awoke, got the children up, and went to Tiegen's CB where she bought a coke out of the coke machine. She then "proceeded over to Micah Majors', who lived behind the Ford dealership." Officer Gwyn, who was aware that no residences were behind the Ford dealership, further questioned the appellant concerning the location of Micah Majors' home. The appellant explained that "he lived out past Eva's Dairy Chef at [the] Scottish Inn." She stated that she arrived at Micah's around 10:00 a.m. and she fell asleep. At 1:00 p.m., she awoke and went to the hospital.

During the interview, Agent Gwyn noticed the odor of alcohol on the appellant. He requested that a sample of her blood be taken. The appellant agreed to the sample as long as only one tube of blood was taken and as long as she was only "stuck" one time. These conditions were complied with and the blood sample was drawn at 2:00 p.m.

After talking with the appellant, Agent Gwyn determined that the appellant's car constituted a crime scene. The car was parked immediately outside the emergency room entrance and was unlocked with the windows rolled down. As such, Agent Gwyn felt that the car could have easily been tampered with or moved. He ordered that crime scene tape be placed around the vehicle. Moreover, because a crowd of people was gathering around the car, he made arrangements to transport the vehicle to the McMinnville Police Department impound lot. The subsequent search of the vehicle, conducted several days after the incident, revealed three baby bottles on the back floorboard and a 750 milliliter bottle of Crown Royal Blended Canadian Whiskey, which was approximately one-third full, under the driver's seat.

Raymond Siler, Jr., a forensic scientist employed by the Tennessee Bureau of Investigation, conducted the analysis of the appellant's blood sample and

determined that the appellant's blood alcohol content at 2:00 p.m. on June 6, 1995, was ".06 gram percent." In rebuttal of this testimony, the defense introduced Dr. Johnathan Cowan and Dr. Terry Holmes, who testified that the appellant had a fungal infection on her arm and that such infection could skew the results of a blood alcohol test. Despite the testimony of the defense experts, Siler testified that he had never heard that contamination could occur in a preserved blood sample.

Dr. Charles Harlan, the medical examiner, testified that, through the process of extrapolation, the appellant would have had a blood alcohol content of around .1925 at five in the morning, if she had stopped drinking at that time. Otherwise, he stated, in order to reach a blood alcohol level of .06 percent, an individual would be required to consume three units of alcohol in one hour. The autopsies performed by Dr. Harlan revealed that the two young boys died of systemic hyperthermia, a condition where the entire body is overheated and unable to cool itself, as a result of being locked in the appellant's vehicle. Based upon established studies of ambient temperatures, Dr. Harlan testified that the temperature in the vehicle was approximately 120 degrees at noon on June 6, 1995. He further testified that

> Whenever the body temperature rises so that the body temperature is around one hundred and six (106) degrees Fahrenheit or about forty-one (41) degrees Centigrade, then, a person may have what is called heat stroke, and they may die as a result of systemic hyperthermia - that is, increased body temperature.
>
> A person would usually become unconscious when the body temperature is at a level of one hundred six degrees Fahrenheit . . . . When you reach a temperature of about one hundred and seven point five degrees or higher, you start to coagulate the body protein itself.

Dr. Harlan opined that the two children died at some time between 6:00 a.m. and 12:00 noon on June 6th, 1995.

In her defense, the appellant introduced proof to establish that she suffered from Bipolar Disorder/manic depression and that the deaths of her children were an accident. Eddie and Janie Bain, the appellant's parents, testified that the appellant

had both academic and social problems in school and did not want to associate with other people.[2] Her mother testified that the appellant, at age six, began experiencing sleep disorders where she would not sleep for two to three days, ultimately going into such a deep sleep that she could not be awakened. The appellant also complained of visual and auditory hallucinations. Despite these occurrences, neither Mr. nor Mrs. Bain sought medical or psychological treatment for their daughter. Mrs. Bain confirmed that the appellant "self-medicated" herself with an over-the-counter stimulant, MaxAlert. Both parents admitted that they would have gladly watched the appellant's children had the appellant asked. Despite the appellant's problems as a teenager, Mrs. Bain thought that the appellant was fully capable of taking care of her children. After the death of her children, the appellant attempted suicide. Mr. and Mrs. Bain placed their daughter under a "suicide watch," where they tried to watch her at all times. However, Mrs. Bain admitted that the appellant had recently left the house at three o'clock in the morning to visit Micah Majors. Soon thereafter, her mother took her daughter to see Dr. Terry Holmes, a psychiatrist in McMinnville.

Dr. Holmes testified that, based upon his evaluation of the appellant in August, 1995, she suffered from "Bipolar Disorder," marked by periods of depression and mania, which in her case included a sleep disorder. He stated that

> Bipolar mania are very uncomfortable people. They have lots and lots of agitation, and they tend to say, 'Doctor, my nerves are killing me.' You can have several kinds of manifestations of psychosis which is loosely defined as loss of contact with reality; hallucinations. . . . Also, there is a disturbance with the efficiency of thought. . . . Logic and reasoning are compromised to a great extent. People don't think before they act. . . .

During cross-examination, Dr. Holmes, in rejecting the contention that the appellant was insane, stated,

---

[2]On cross-examination of Mrs. Bain, the State produced evidence that the appellant had consistently scored well within her expected level of performance throughout her school years.

9

This lady definitely knows the difference between right and wrong. My point is she simply didn't think.

. . .

I think she thought [that leaving her children in the locked car] was a reasonable thing to do at the time, if she thought at all. And I don't think she thought about it . . . she has remarkable impairments in [her concentration].

. . .

[S]he may have, from time to time, thought about it, but her mind went quickly on to other things. This is a woman who is pretty driven to do whatever it was she was doing upstairs.

The appellant, taking the stand on her own behalf, testified that she would not make any excuses for what had happened to her children. Despite making this statement, the appellant testified that she did not see any danger in leaving her thirteen month old and twenty-three month old sons in her locked car for over nine hours while she visited with Micah Majors in his motel room. Despite the previous testimony of the four young men that were in the motel room that night, the appellant claimed that "[she] checked on the kids four to five times." However, she could not explain why she did not tell the others that her children were in her car or that she needed to check on them.

The State called, as a rebuttal witness, Pam Rhea, who had babysat the appellant's children from August 1994 until March 1995. Ms. Rhea testified that, during the period that she watched the appellant's children, the appellant worked second shift at Calsonic. The appellant would drop off the children at 2:30 p.m. and would pick them up at 1:00 a.m. On February 20, 1995, the appellant advised Ms. Rhea that she had been terminated from Calsonic. Despite the appellant's unemployment, Ms. Rhea continued to care for the appellant's children throughout March 1995. Ms. Rhea recalled one incident, on March 22, where the appellant dropped her children off at 1:00 a.m. and did not return for them until the following morning at 2:00 a.m. (approximately twenty-five hours). During the appellant's unexplained absence, she never called Ms. Rhea to check on her children. When the appellant finally returned for her children, she informed Ms. Rhea that she had

been out with some friends and that she needed to go somewhere and sober up before picking up the children.

Based upon this evidence, the jury returned guilty verdicts as to two counts of aggravated child abuse.

## I. Motion to Suppress

The appellant contends that the trial court erred by admitting into evidence (1) the appellant's statement to Agent Gwyn, (2) the seizure of a blood sample from the appellant's person and the subsequent results of the blood alcohol test, and (3) the seizure of her vehicle and its contents. Additionally, the appellant asserts that, because the trial court failed to enter sufficient findings of facts upon denying her motion to suppress, this court must exercise an independent *de novo* review of the constitutional questions presented.

## A. Standard of Appellate Review

The evidence presented in support of motions to suppress are generally determined by the facts and circumstances surrounding the challenged event. In other words, such issues are factually driven. Where resolution of factual issues are central to the determinations made by the trial court, Tenn. R. Crim. P. 12(e) requires the trial court to state its essential findings on the record. In the case before us, the trial court made no specific oral or written findings of fact.[3]

---

[3]The appellant's claim arises from the presumption that "the factual and legal findings on suppression motions are virtually conclusive on appeal unless the defense can show that there was no evidence to support the findings of the trial court." Appellant's Brief, at 60 (citing State v. Stearns, 620 S.W.2d 92 (Tenn. Crim. App. 1981)).

Our standard of appellate review on suppression issues was firmly established in State v. Odom, 928 S.W.2d 18,23 (Tenn. 1996), which held that:

Because of the trial court's failure to articulate its findings on the record, the appellant asks this court to become the finders of fact, the arbitrators of credibility, and the assessors of the evidence. However, this court lacks the jurisdiction to do so. Tenn. Code Ann. § 16-5-108 (1994). Thus, we are constrained in reviewing, *de novo*, the application of the law to the facts, while we accredit the ruling of the trial court, if such ruling is supported by the evidence. See State v. Bridges, 963 S.W.2d 487, 490 (Tenn. 1997). See also Ornelas v. United States, 517 U.S. 690, 699, 116 S.Ct. 1657, 1663 (1996) ("a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges . . . ."). If the trial court's findings of fact are not precise and cannot be substantially supplemented by the record, an appellate court is prevented from completing any meaningful review of the law applicable to those pertinent facts. However, we find that the evidence introduced at the suppression hearings, relative to the issues now before us, was sufficiently developed.[4] Accordingly, we proceed with a *de novo* review of the law applicable to the facts viewed in the light most favorable to the State.

## B. Appellant's Statement to Agent Gwyn

The appellant contends that her statement to Agent Gwyn was obtained in violation of her state and federal constitutional rights. Specifically, she asserts that she was never provided her Miranda warnings and that her statement resulted from an unlawful detention. See generally Miranda v. Arizona, 384 U.S. 436, 444, 86

[t]he party prevailing in the trial court is entitled to the strongest legitimate view of the evidence adduced at the suppression hearing as well as all reasonable and legitimate inferences that may be drawn from it. So long as the greater weight of the evidence supports the trial court's findings, those findings shall be upheld.

[4]We note, however, that had the record not been sufficient regarding the constitutional issues before us, it would be necessary to remand the case to the trial level for completion of the record. See House v. State, 592 S.W.2d 902, 904 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1979).

S.Ct. 1602, 1612 (1966); Florida v. Royer, 460 U.S. 491, 103 S.Ct. 1319 (1993).

The Fifth Amendment protection against self-incrimination " privileges a person not to answer official questions put to him in any proceeding, civil or criminal, where the answers might incriminate him in future criminal proceedings." Minnesota v. Murphy, 465 U.S. 420, 426, 104 S.Ct. 1136, 1141 (1984). In fact, the statements of an accused made during the course of custodial interrogation are inadmissible as evidence unless the State establishes that the accused was advised of certain constitutional rights and waived those rights. State v. Anderson, 937 S.W.2d 851, 853 (Tenn. 1996). Although we acknowledge an individual's constitutional right against self-incrimination and right to be forewarned of these rights, we likewise recognize that voluntary statements, even if incriminating, are not barred by the Fifth Amendment. See Miranda v. Arizona, 384 U.S. at 436, 86 S.Ct. at 1602; see also California v. Beheler, 463 U.S. 1121, 103 S.Ct. 3517 (1983); Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711 (1977); Beckwith v. United States, 425 U.S. 341, 96 S.Ct. 1612 (1976). It is only "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning [that] the privilege against self-incrimination is jeopardized" requiring the authorities to adequately advise the individual of his constitutional protections. Miranda, 384 U.S. at 444, 86 S.Ct. at 1612. In other words, before Miranda warnings are required, the accused must be the subject of custodial interrogation. Miranda, 384 U.S. at 444, 86 S.Ct. at 1612.

In determining whether an individual is "in custody" as contemplated by Miranda, it is incumbent upon the reviewing court to decide whether, "under the totality of circumstances, a reasonable person in the suspect's position would consider himself or herself deprived of freedom of movement to a degree associated with formal arrest." Anderson, 937 S.W.2d at 855. Factors relevant to this determination include, but are not limited to the following:

13

# the time and location of the interrogation
# the duration and character of the questioning
# the officer's tone of voice and general demeanor
# the suspect's method of transportation to the place of     questioning;
# the number of police officers present
# any limitation on movement or other form of restraint imposed on the suspect during the interrogation;
# any interactions between the officer and the suspect
# the suspect's verbal or nonverbal responses
# the extent to which the suspect is confronted with the law enforcement officer's suspicions or evidence of guilt
# the extent to which the suspect is made aware that he or she is free to refrain from answering questions or to end the interview at will.

Anderson, 937 S.W.2d at 855 (citations omitted).


Considering the totality of the circumstances now before us, we hold that the evidence, taken in the light most favorable to the State, supports a conclusion that the appellant was not in custody when she gave her statement to Agent Gwyn. The appellant was already sitting in the physicians' lounge when approached by Agent Gwyn and she made no attempt to leave. Agent Gwyn repeatedly told the appellant that she was not under arrest and that she was free to leave at any time. Indeed, at the time of the interview, Agent Gwyn was not certain that the deaths of the children were the result of criminal conduct. At no time did Gwyn threaten or coerce the appellant into providing a statement. In fact, the appellant agreed to talk with Gwyn, and was responsive to the questions posed to her. Although defense witnesses testified that they were prevented from entering the physicians' lounge by deputies during the interview, they were only prevented from entering pursuant to the appellant's request that she did not wish to see any family members. Under these circumstances, a reasonable person in the appellant's position would not have considered himself or herself deprived of freedom of movement to a degree associated with formal arrest. Therefore, the appellant's statement did not arise from a custodial environment with the attendant entitlement to Miranda warnings. Moreover, despite the apparent emotional state of the appellant at the time of the interview, the evidence at the suppression hearing indicates that the appellant's

14

responses were voluntary. This issue is without merit.

### C. Seizure of the Blood Sample

The appellant also contests the seizure of the blood sample taken from her person and the ensuing results of the blood alcohol tests performed on that sample. The appellant's argument is twofold. First, the appellant contends that the blood sample was seized as a result of her unlawfully obtained statement, and thus, should have been excluded under the "fruit of the poisonous tree doctrine." As we have concluded that the appellant's statement was not obtained in violation of any of her constitutional rights, this claim is without merit. Second, the appellant contends that the blood sample was taken without her consent and was the effective result of coercive police tactics. We disagree.

The withdrawal of blood from a subject for purposes of serological testing for the presence of alcohol or drugs constitutes a search within the constraints of the Fourth Amendment and, therefore, a search warrant is generally required. See Schmerber v. California, 384 U.S. 757, 767-72, 86 S.Ct. 1826, 1833-37 (1966); see also State v. Jackson, 889 S.W.2d 219, 221 (Tenn. Crim. App. 1993), perm. to appeal denied, (Tenn. 1994). Unless it falls within a specifically established and well-delineated exception, a search conducted without a warrant is *per se* unreasonable. Schneckloth v. Bustamonte, 412 U.S. 218, 219, 93 S.Ct. 2041, 2043 (1973) (citations omitted). "One of the specifically established exceptions to both a warrant and probable cause is a search that is conducted pursuant to a voluntarily given consent." Id. at 219, 93 S.Ct. at 2043-2044 (citations omitted); see also State v. Bartram, 925 S.W.2d 227, 230 (Tenn. 1996). The burden of proof rests upon the State to show, by a preponderance of the evidence, that the consent to a warrantless search was given freely and voluntarily. Schneckloth, 412 U.S. at 248-49, 93 S.Ct. at 2059; Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788,

1792 (1968); Bartram, 925 S.W.2d at 230.  The question of whether the appellant voluntarily consented to the search is a question of fact which focuses upon the totality of the circumstances.  Schneckloth, 412 U.S. at 248-249, 93 S.Ct. at 2059.

In the present case, the testimony revealed that, upon observing an odor of alcohol on the appellant, Agent Gwyn requested that the appellant provide a blood sample.  The appellant agreed on the condition that "you stick me one time and take one vial of blood."  The appellant "put her arm out there; she voluntarily gave it.  And, when the nurse stuck the needle in there, she showed no signs that it hurt or anything."  A trial court's finding that a search is consensual is presumed correct and is conclusive on appeal unless the evidence preponderates against the ruling.  State v. Woods, 806 S.W.2d 205, 208 (Tenn. Crim. App. 1990), perm. to appeal denied, (Tenn. 1991), cert. denied, 502 U.S. 1079, 112 S.Ct. 986 (1992); see also State v. Dougherty, 930 S.W.2d 85, 86 (Tenn. Crim. App. 1996).  We conclude that the evidence in the record supports the trial court's finding.  This issue is without merit.

## D.  Search of the Appellant's Vehicle

In her final suppression issue, the appellant asserts that the warrantless seizure of her vehicle and the subsequent search and seizure of its contents were unlawful.  Specifically, the appellant adopts her argument previously relied upon for suppression of the blood sample: that the search was the product of illegally obtained statements.  Again, this claim is without merit as we have determined the appellant's statement to be voluntarily given.  The appellant also asserts that the search was unlawful because the search was conducted without a warrant and no warrant exception was presented by the State to justify the search.

The record before this court reveals that, after obtaining the appellant's statement, probable cause existed for Agent Gwyn to search the vehicle for "property that constitutes evidence of the commission of a criminal offense." See Tenn.R.Crim.P. 41(b)(1). At that time, the appellant's vehicle was parked outside the emergency room entrance to the hospital. The vehicle was unlocked and the windows were rolled down. Agent Gwyn instructed officers to secure the vehicle with crime scene tape. However, because a crowd of people were gathering around the vehicle and because the vehicle was blocking the emergency entrance, he later made arrangements for the vehicle to be moved to the McMinnville Police Department impound lot. The actual search of the vehicle was conducted one or two days later without a warrant, revealing a one-third full 750 milliliter bottle of whiskey. At the conclusion of the appellant's motion to reconsider the search of the vehicle, the trial court concluded that "the exigencies did, based upon the proof I heard, permit [the vehicle] to be searched in the fashion and way it was."

As previously stated, the analysis of any warrantless search and seizure begins with the proposition that such searches are *per se* unreasonable under the Fourth Amendment, unless it falls within a specifically delineated exception. Schneckloth, 412 U.S. at 219, 93 S.Ct. at 2043 (citations omitted). Our supreme court has recognized that a warrantless search of a vehicle in a public place, in the aftermath of a crime, and when there is probable cause to believe the vehicle contains items that are subject to seizure, is entitled to a conclusive presumption of exigency, permitting the warrantless search, even absent actual likelihood of risk of delay in obtaining a warrant. State v. Leveye, 796 S.W.2d 948, 952 (Tenn. 1990) (adopting the rule of California v. Carney, 471 U.S. 386, 105 S.Ct. 2066 (1985)). If a warrantless search at the scene is permissible, then the police may seize the vehicle and later conduct the search at the station. See Florida v. Myers, 466 U.S. 380, 182, 104 S.Ct. 1852, 1853 (1984); Michigan v. Thomas, 458 U.S. 259, 261, 102 S.Ct. 3079, 3080 (1982). In the present case, Agent Gwyn was aware that the

17

appellant had brought her two children to the emergency room in her vehicle. After interviewing the appellant, he determined that the vehicle was the scene of the crime and probable cause existed to believe that the vehicle contained evidence of that crime. Thus, a warrantless search of the vehicle was permissible. Moreover, due to the location of the vehicle and the crowd of people gathering around it, Agent Gwyn was justified in securing and transporting the vehicle to the impound lot.

The appellant additionally argues that the delay in conducting the search of the vehicle is *per se* unreasonable. We disagree. There is no requirement that the warrantless search of the vehicle occur contemporaneously with its lawful seizure. United States v. Johns, 469 U.S. 478, 484, 105 S.Ct. 881, 885 (1985) (citing Texas v. White, 423 U.S. 67, 68, 96 S.Ct. 304, 305 (1975) (*per curium*); Chambers v. Maroney, 399 U.S. 42, 52, 90 S.Ct. 1975, 1981 (1970)). The "justification to conduct such a warrantless search does not vanish once the car has been immobilized." Thomas, 458 U.S. at 261, 102 S.Ct. at 3081. A vehicle lawfully in police custody may be searched on the basis of probable cause to believe that it contains contraband, and there is no requirement of exigent circumstances to justify such a warrantless search. United States v. Johns, 469 U.S. at 484, 105 S.Ct. at 885 (citations omitted). Although police officers may not indefinitely retain possession of a vehicle and its contents before they complete a vehicle search, we conclude that a search conducted within two days of the lawful seizure is not unreasonable and is consistent with precedent involving searches of impounded vehicles. See Tenn. Code Ann. § 40-6-107 (1990) ("[a] search warrant shall be executed and returned to the magistrate by whom it was issued within five (5) days after its date, after which time, unless executed, it is void.") This issue is without merit.

18

**II. Constitutionality of Tenn. Code Ann. § 39-15-401 and § 39-15-402**

The appellant contends that "Tenn. Code Ann. § 39-15-401 (child abuse) and Tenn. Code Ann. § 39-15-402 (aggravated child abuse) are unconstitutionally vague on their face." Specifically, she asserts that "the phrases 'inflict injury' and 'adversely affect the child's health and welfare' in Tenn. Code Ann. § 39-15-401 and 'act of abuse' in Tenn. Code Ann. § 39-15-402 are so vague that persons of common intelligence must necessarily guess at their meaning and differ as to their application." Alternatively, she argues that, even if the statutes are constitutional on their face, they have been unconstitutionally applied under the facts of the present case.

A basic principle of due process is that an enactment whose prohibitions are not sufficiently or clearly defined is void for vagueness. See State v. Malady, No. 02C01-9506-CR-00166 (Tenn. Crim. App. at Jackson, Jul. 26, 1996). However, due process does not require that a statute be drafted with unequivocal certainty. State v. McDonald, 534 S.W.2d 650, 651 (Tenn. 1976), cert. denied, 425 U.S. 955, 96 S.Ct. 1733 (1976). All that is required is that the law give sufficient warning so that men may conduct themselves so as to avoid that which is forbidden. See State v. Baghdadi, No. 03C01-9403-CR-00112 (Tenn. Crim. App. at Knoxville, Nov. 27, 1995), perm. to appeal denied, (Tenn. May 13, 1996) (citing Rose v. Locke, 423 U.S. 48, 50, 96 S.Ct. 243, 244 (1976)).

When reviewing a statute for a possible constitutional infirmity, we are required to indulge every presumption and resolve every doubt in favor of the constitutionality of the statute. Petition of Burson, 909 S.W.2d 768, 775 (Tenn. 1995) (citation omitted). Nevertheless, to survive a constitutional challenge for vagueness, "[a penal] statute must 'give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly.'"

State v. Lakatos, 900 S.W.2d 699, 701 (Tenn. Crim. App. 1994), perm. to appeal denied, (Tenn. 1995) (citing Grayned v. City of Rockford, 408 U.S. 104, 108, 92 S.Ct. 2294, 2298 (1972)).  See also Kolender v. Lawson, 461 U.S. 352, 357, 103 S.Ct. 1855, 1858 (1983); Davis-Kidd Booksellers, Inc. v. McWherter, 866 S.W.2d 520, 532 (Tenn. 1993); State v. Lyons, 802 S.W.2d 590, 591 (Tenn. 1990).  "No one may be required at peril of life, liberty, or property to speculate as to the meaning of penal statutes.  All are entitled to be informed as to what the state commands or forbids."  Lanzetta v. State of New Jersey, 306 U.S. 451, 453, 59 S.Ct. 618, 619 (1939).  Moreover, the statute should not encourage arbitrary or discriminatory enforcement.  Lakatos, 900 S.W.2d at 701.  See also  Kolender, 461 U.S. at 357, 103 S.Ct. at 1858; Davis-Kidd, 866 S.W.2d at 532; Lyons, 802 S.W.2d at 591.  Finally, the standard of certainty required in criminal statutes is generally more exacting than in noncriminal statutes.  Leech v. American Booksellers Ass'n, Inc., 582 S.W.2d 738, 746 (Tenn. 1979) (citation omitted).

The challenged statutes read, in pertinent part:

**Tenn. Code Ann. § 39-15-401.  Child Abuse and neglect.** -- (a) Any person who knowingly other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare is guilty of a Class A misdemeanor provided, that if the abused child is six (6) years of age or less, the penalty is a class D felony.

**Tenn. Code Ann. § 39-15-402.  Aggravated child abuse.** -- (a) A person is guilty of the offense of aggravated child abuse who commits the offense of child abuse as defined in § 39-15-401 and; (1) The act of abuse results in serious bodily injury to the child.

(emphasis added).

Again, the appellant challenges Tennessee's child abuse statute on the grounds that the phrases "inflict injury" and "adversely affect the child's health and welfare" are unconstitutionally void for vagueness.  Specifically, she asserts that the term "injury" "could include physical, emotional or pecuniary injury. . . .  Thus, the phrase 'inflict injury' is entirely subjective and does not give a person of common

20

intelligence fair warning or reasonable notice of what conduct is prohibited." This same argument was rejected by a panel of this court in State v. Baghdadi, No. 03C01-9403-CR-00112. In Baghdadi, Judge Tipton, writing on behalf of a unanimous panel of this court, held that "[w]e do not judge the constitutionality of a statute by theorizing all of its possible applications to determine if any application of the statute could be unconstitutional." Moreover, because "a statute may prohibit some conduct with sufficient clarity, although it may be vague if applied to other conduct, . . . a defendant may be limited to challenging only his own conduct under the statute." Baghdadi, No. 03C01-9403-CR-00112. "Injury" as contemplated within the meaning of Tenn. Code Ann. § 39-15-401(a), encompasses "any reasonable definition of the term." Id. Clearly, bodily injury resulting in death is necessarily included within this definition. This challenge is without merit.

The appellant also contends that the challenged statute fails to define what conduct may "adversely affect the child's health and welfare." Again, we find her claim to be without merit. In State v. Smith, C.C.A. No. 1153 (Tenn. Crim. App. at Knoxville, Sept. 20, 1990), a panel of this court held that "[t]he neglect of 'a child so as to adversely affect its health and welfare' presents a plain and certain meaning. The warning of the prohibited conduct is . . . sufficiently clear." We are in accord with the previous rulings of this court. This issue is likewise without merit.

Finally, the appellant claims that Tenn. Code Ann. § 39-15-402(a)(1) and (2) only defines as an offense an "act of abuse," whereas, Tenn. Code Ann. § 39-15-401 refers to both "abuse" and "neglect." Accordingly, she argues that "it is unclear whether the neglect that adversely affects the child's health and welfare that results in serious bodily injury constitutes aggravated child abuse under Tenn. Code Ann. § 39-15-402(a)(1)." In other words, the appellant argues that "[l]eaving a child unattended in a car is possibly child neglect but it may not be an affirmative 'act of abuse.'"

21

This court's primary goal in interpreting statutes is to determine the legislative intent behind the statute. State v. Smith, 893 S.W.2d 908, 917 (Tenn. 1994), reh'g denied, (Tenn. 1995), cert. denied, 516 U.S. 829, 116 S.Ct. 99 (1995). In doing so, we look first to the statute itself and rely upon the plain meaning of the language and terms used. Id. The challenged statute clearly, from its plain language, includes as acts of aggravated child abuse any offense defined under Tenn. Code Ann. § 39-15-401(a) which results in serious bodily injury, as in the present case, or is committed with a deadly weapon. Cf. *Comments*, Tennessee Attorneys Memo Legislation Service, p.25 (June 16, 1998). Tenn. Code Ann. § 39-15-401 includes both child abuse and child neglect. Although this statute could have been drafted with greater precision, this alone does not invalidate the statute under the vagueness doctrine. Lyons, 802 S.W.2d at 592. See also State v. Lunati, 665 S.W.2d 739 (Tenn. Crim. App.), perm. to appeal denied, (Tenn. 1983), cert. denied, 466 U.S. 938, 104 S.Ct. 1913 (1984). The appellant is correct in her assertion that "this is not an academic debate." The statute in question is clear and unambiguous and it is our duty to construe it as it was written by the General Assembly, and not as the appellant desires. Gabel v. Lerma, 812 S.W.2d 580, 583 (Tenn. App.), perm. to appeal denied, (Tenn. 1990) (citing Jackson v. Jackson, 210 S.W.2d 332 (1948)). We remain mindful that penal statutes are to be construed according to the fair import of their terms, to promote justice, and to effect the objective of the criminal code. Tenn. Code Ann. § 39-11-104 (1991). Accordingly, we conclude that a common sense reading of the challenged provision fails to support the appellant's argument. This issue is without merit.

### III. Aggravated Child Abuse as Lesser Included Offense

The appellant was indicted and charged with two counts of first degree murder under Tenn. Code Ann. § 39-13-202(a)(4) (1994 Supp.), which defines first

22

degree murder as the "reckless killing of a child less than sixteen years of age, if the child's death results from aggravated child abuse, as defined by § 39-15-402, committed by the defendant against the child."  The trial court instructed the jury as to the elements of this offense and as to the elements of the offense of aggravated child abuse as defined by Tenn. Code Ann. § 39-15-402.  The jury returned a verdict of not guilty as to the two counts of first degree murder.  However, they did find the appellant guilty of two counts of aggravated child abuse under Tenn. Code Ann. § 39-15-402.

The appellant now contends that her convictions for aggravated child abuse are void "since [aggravated child abuse] is not an included offense of first degree child murder."  Specifically, the appellant argues that, because she was charged with the "reckless" killing of her children, "aggravated child abuse cannot be a lesser included offense of this species of homicide since child abuse requires the higher mental state of 'knowingly.'"[5]  Although the appellant concedes that, by statute, misdemeanor child abuse may be a lesser included offense to homicide,  see  Tenn. Code Ann. § 39-15-401(d);[6] State v. Roberson, No. 02C01-9503-CC-00059 (Tenn. Crim. App. at Jackson, Dec. 28, 1995), she argues that aggravated child abuse is not, as it contains no comparable provision.

> Tennessee law recognizes two types of lesser offenses that may be included in the offense charged in an indictment and, may, therefore, form the basis for a conviction: a lesser grade or class of the charged offense and a lesser included offense.  The two, though similar, are not synonymous.

---

[5] In addressing the offense of first degree murder by aggravated child abuse, a panel of this court recently held that "[t]here is nothing inconsistent about a reckless killing being committed in the course of a knowing child abuse."  State v. Roberson, No. 02C01-9702-CC-00083 (Tenn. Crim. App. at Jackson, Jan. 23, 1998)(comparing § 39-13-202(a)(4) with the concept of felony murder, § 39-13-202(a)(2)).

[6]Tenn. Code Ann. § 39-15-401(d) provides, in part: "[a] violation of [39-15-401(a)] may be a lesser included offense of any kind of homicide . . . if the victim is a child and the evidence supports a charge under this section."

23

State v. Trusty, 919 S.W.2d 305, 310 (Tenn. 1996). An offense is "lesser included" in another "if the elements of the greater offense, as those elements are set forth in the indictment, include but are not congruent with, all the elements of the lesser." Trusty, 919 S.W.2d at 310-311 (quoting Howard v. State, 578 S.W.2d 83, 85 (Tenn. 1979)). However, a lesser "grade or dass" of offense is established by the legislature and is determined simply by reading the statutory provisions.[7] Trusty, 919 S.W.2d at 310.

Necessarily included within the offense of aggravated child abuse, as defined in Tenn. Code Ann. §39-15-402, is the offense of child abuse and neglect, as defined in Tenn. Code Ann. § 39-15-401. Tenn. Code Ann. § 39-15-401(d) provides that, if fairly raised by the evidence, child abuse is a lesser offense of first degree murder. See Roberson, No. 02C01-9503-CC-00059. This provision, despite the appellant's assertions, is necessarily encompassed within the aggravated child abuse statute. Accordingly, we hold that, in the present case, aggravated child abuse is a lesser included offense of first degree murder as defined in Tenn. Code Ann. § 39-13-202(a)(4). See Roberson, No. 02C01-9503-CC-00059 (holding by implication that aggravated child abuse is a lesser offense of first degree murder). This issue is without merit.

## IV. Sufficiency of the Evidence

The appellant next contends that the evidence is insufficient to support her convictions for aggravated child abuse because the State failed to prove "knowing

---

[7]In other words, although generally to the contrary, an offense may be a lesser grade or class of offense even though it requires the same or higher culpability than that required by the greater offense. For example, voluntary manslaughter, which requires the mental state of knowing, is not a lesser included offense of second degree murder (also requiring a knowing mental state) because it requires the additional element of provocation. However, voluntary manslaughter is a lesser grade or class of second degree murder because of the statutory grading of homicide offenses established by our legislature.

conduct" beyond a reasonable doubt, *i.e.*, that she "was actually aware that her conduct was reasonably certain to cause the resulting injury to her children." Specifically, the appellant challenges the trial court's instructions to the jury as they relate to the requisite mental state of "knowing" as the definition of this term applies to the offense of aggravated child abuse.[8]  She argues that the erroneous charge altered the State's burden of proving the elements of the offense beyond a reasonable doubt.

We begin our analysis of the appellant's issue by first noting that the implications of this issue extend beyond the boundaries of this case.  The appellant's challenge assails the method by which juries are currently instructed as to the requisite mental state of the charged offense.  With this in mind, we write not with the purpose of reaching a desired result but, rather, of effecting the intent of our legislature as expressed in its enactment of our criminal code.

## A.  Theories of Culpable Mental States

Central to the concept of criminal liability is that, before there can be a crime, there must be an act, or *actus reus*, which must be accompanied by a criminal mind, or *mens rea*.  The early concept of *mens rea* meant little more than a "general notion of blameworthiness," or an "evil meaning mind."  See  21 AM. JUR. 2D *Criminal Law* § 129 (1981).  Over time, this general concept shifted from this vague notion of wickedness to a more definite requirement of a specific state of mind to do that which is prohibited by the criminal law.  Thus, no longer could the requirement of "wickedness" suffice.  Rather, a different state of mind was required for each crime. This development in the common law culminated in the creation of eighty or so

---

[8]We note that the appellant's sufficiency argument also encompasses her challenge to the trial court's instruction on the definition of "knowingly."  As one issue cannot be addressed without logical reference to the other, both will be considered in our analysis of the sufficiency of the evidence.

culpability terms. See generally Paul H. Robinson, *Element Analysis in Defining Criminal Liability: The Model Penal Code and Beyond*, 35 Stan. L. Rev. 681, 691 (1983). Even with a specific mental state existing for each offense, under this "offense analysis," of culpability, it was soon recognized that each specific mental state was multifaceted. Id. In a traditional "offense analysis" offenses were referred to simply in terms of one encompassing mental state for the offense, *i.e.*, an intentional offense, a knowing offense or a reckless offense. Prior to the enactment of our 1989 code, this state employed "offense analysis." However, where different culpability requirements are appropriate for different elements, offense analysis fosters definitions that obscure the requisite mental state. Id. As in the case of the offense of possession of a controlled substance with the intent to sell, Tenn. Code Ann. § 39-17-417(4) (1997), proof of different mental states are required for the respective elements of (1) the knowing possession of a controlled substance and (2) the intent to sell the same.[9]

The plethora of *mentes reae* originating from the common law created much confusion and ambiguity. Thus, in 1955, the drafters of the Model Penal Code sought to eliminate this confusion and narrowed the multitude of existing culpability terms to four: purpose, knowledge, recklessness, and negligence. See MODEL PENAL CODE § 2.02 (1985); see also Tenn. Code Ann. § 39-11-301(a)(1) (1991) (delineating the levels of culpability and providing that "a person commits an offense who acts intentionally, knowingly, recklessly, or with criminal negligence)." In furtherance of this concept, the Model Penal Code and, subsequently the

---

[9]The greater area of confusion is found in those multiple culpability crimes which provide for no culpable mental state in the definition of the offense. Under the provisions of our criminal code, if the mental state for the respective element is not defined in the offense, "intent, knowing or reckless suffices . . . with respect to each element of the offense." Tenn. Code Ann. § 39-11-301(a)(1). For example, the offense of aggravated sexual battery, causing bodily injury, Tenn. Code Ann. § 39-13-504 (1997), contains two elements: (1) unlawful sexual contact and (2) bodily injury. Because the definition of sexual contact requires an "intentional" touching, the requisite mental state for this element is that of "intentional." However, because the offense defines no mental state for "bodily injury," a mental state of either "intentional, knowing or reckless suffices."

Tennessee Criminal Code,[10] provide that, with the exception of strict liability

offenses, some mental culpability "must be faced separately <u>with respect to each

material element of the crime</u>," otherwise, no valid conviction may be obtained.[11]

COMMENTS, MODEL PENAL CODE § 2.02 (emphasis added); Tenn. Code Ann. § 39-11-

301(a)(1).  Moreover, the Model Penal Code and the Tennessee Criminal Code both

require that one of four levels of culpability must be proven with respect to each

"material element" of the offense which may involve "(1) the nature of the forbidden

conduct; (2) the attendant circumstances; or (3) the result of the conduct."

COMMENTS, MODEL PENAL CODE § 2.02; <u>see also</u>  Tenn. Code Ann. § 39-11-

201(a)(1) (1991) (providing that "no person may be convicted of an offense unless

---

[10]On November 1, 1989, Tennessee enacted a new criminal code which was in large part an adoption of the American Law Institute's Model Penal Code.  Among the advantages of adopting a Model Penal Code provision is recourse to the commentary which accompanies the provision and to judicial decisions from other Model Penal Code states.  However, caution is often advised when reviewing judicial decisions as variations are found in the criminal statutes from state to state.  In this regard, we acknowledge that a significant portion of the Tennessee Criminal Code, including those provisions which deal with the general principles of criminal liability, were largely adopted from the Texas derivation of the Model Penal Code.  <u>See</u>  Derivation Comments, *Proposed Draft*, Tenn. Code Ann. § 39-403 (1973).

[11]MODEL PENAL CODE § 2.02 provides in parts pertinent to the issue before us:
(1) <u>Minimum Requirements of Culpability</u>. . . . a person is not guilty of an offense unless he acted purposely, knowingly, recklessly or negligently . . . with respect to each material element of the offense.

(2) <u>Kinds of Culpability Defined</u>.
    . . . (b) <u>Knowingly</u>.
    A person acts knowingly with respect to a material element of an offense when:
    (i) if the element involves <u>the nature of his conduct or the attendant circumstances</u>, he is aware that his conduct is of that nature or that such circumstances exist; and
    (ii) if the element involves a <u>result of his conduct</u>, he is aware that it is practically certain that his conduct will cause such a result. . .

Comparatively, relevant portions of the Tennessee Code provide:

**Tenn. Code Ann. § 39-11-201** - (a) No person may be convicted of an offense unless each of the following is proven beyond a reasonable doubt:
    (1) <u>The conduct, circumstances surrounding the conduct, or a result of the conduct described</u> in the definition of the offense;
    (2)  The culpable mental state required . . .

**Tenn. Code Ann. § 39-11-301** - (a)(1) A person commits an offense who acts intentionally, knowingly, recklessly or with criminal negligence, as the definition of the offense requires, <u>with respect to each element of the offense</u> . . .

**Tenn. Code Ann. § 39-11- 302** - . . . (b) "Knowing" refers to a person who acts knowingly <u>with respect to the conduct or to circumstances surrounding the conduct</u> when the person is aware of the nature of the conduct or that the circumstances exist.  A person acts knowingly with <u>respect to a result of the person's conduct</u> when the person is aware that the conduct is reasonably certain to cause the result. . . .

27

each of the following is proven beyond a reasonable doubt: (1) The conduct, circumstances surrounding the conduct, or a result of the conduct described in the definition of the offense.").

The definition of each culpability term with respect to each "conduct element" of an offense reflects a fundamental and critical principle of the Model Penal Code's culpability scheme, the application of an "element analysis" of culpability requirements, *i.e.*, different degrees of culpability may be required with respect to different elements of the same offense. See Robinson, *Element Analysis in Defining Criminal Liability: The Model Penal Code and Beyond*, 35 Stan. L. Rev. at 699. Judicial construction or interpretation is not necessary to determine whether our legislature intended to employ "element analysis" within our criminal code. Rather, the legislature's enactment of Tenn. Code Ann. § 39-11-301(a)(b), requiring proof of a culpable mental state "with respect to each element of the offense," expressly provides for the application of element analysis.[12] We acknowledge that our conclusion is in accord with the decisions reached by other Model Penal Code states, including Texas, which have likewise incorporated the Code's innovation of element analysis into their statutory schemes.[13] Accordingly, we proceed utilizing an

_____

[12] See generally Tenn. Code Ann. § 39-11-201(a)(1); -(a)(2); Tenn. Code Ann. § 39-11-301(a)(1); Tenn. Code Ann. § 39-11-302(b). Cf. State v. Parker, 887 S.W.2d 825 (Tenn. Crim. App. 1994); State v. Kimmel, No. 02C01-9701-CR-00006 (Tenn. Crim. App. at Jackson, Jan. 12, 1998) (holding that the *mens rea* requirements of a particular crime may differ with regard to the different elements of the crime).

[13] (citing See, e.g., Ala. Code §§ 13A-2-2 to -2-4 (1982); Alaska Stat. §§ 11.81.600-.610, .900(a) (Supp. 1982); Ariz. Rev. Stat. Ann. §§ 13-105(5), -202 (1978 & Supp. 1982-1983); Ark. Stat. Ann. §§ 41-202 to -204 (1977); Colo. Rev. Stat. §§ 18-1-501(3), -501(5)-(6), -501(8), -503 (1978); Conn. Gen. Stat. Ann. §§ 53a-3(11)-(14), -5 (West 1972); Del. Code Ann. tit. 11, §§ 231, 251-253 (1979 & Supp. 1982); Hawaii Rev. Stat. §§ 704-204, -206 to -208, -212 to -213 (1976); Criminal Code of 1961, §§ 4-3 to -7, -9, Ill. Ann. Stat. cha. 38, 4-3 to -7, -9 (Smith-Hurd 1972); Ky. Rev. Stat. §§ 501.010(1), .020, .030(2)- .050 (1975); Me. Rev. Stat. Ann. tit. 17-A, §§ 34-35 (1982); Mo. Ann. Stat. §§ 562.016, .021, .026 (Vernon 1979); Mont. Code Ann. §§ 45-2-101(33), (37), (58), -103 to -104 (1981); N.H. Rev. Stat. Ann. § 626:2 (1974); N.J. Stat. Ann. § 2C:2-2 (West 1982); N.Y. Penal Law §§ 15.00(6), .05-.15 (McKinney 1975); N.D. Cent. Code §12.1-02-02 (1976); Ohio Rev. Code Ann. § 2901.21-.22 (Page 1982); Or. Rev. Stat. §§ 161.085(6)-(10), .095(2), .105-.115 (1981); 18 Pa. Cons. Stat. Ann. §§ 302, 305 (Purdon 1973); Tex. Penal Code Ann. §§ 6.02-.03 (Vernon 1974); Utah Code Ann. §§ 76-2-101 to -104 (1978); Wash. Rev. Code Ann. § 9A.08.010 (1977)).

element analysis approach.[14]

## B.  Element Analysis

As stated previously, the Model Penal Code recognizes that each culpability term is defined in relation to each "conduct element" of an offense: (1) nature of the conduct; (2) the circumstances at the time; and (3) the result of the conduct.  The first element, conduct, involves the nature of the proscribed act or the manner in which the defendant acts, *e.g.*, the physical act of committing an assault, or the physical restraint of another person (kidnapping).  See  People v. Derrera, 667 P.2d 1363, 1367 ( Colo. 1983) (citing Feinberg, *Toward a New Approach to Proving Culpability: Mens Rea and the Proposed Federal Criminal Code*, 18 Am.Crim.L.Rev. 123, 128 (1980); People v. Noble, 635 P.2d 203 (Colo. 1981); People v. Andrews, 632 P.2d 1012 (Colo. 1981); People v. Curtis, 627 P.2d 734 (Colo. 1981)). The second element, circumstances surrounding the conduct, refers to a situation which relates to the actor's culpability, *e.g.*, lack of victim's consent or stolen status of property. Id.  The result of the defendant's conduct constitutes the final element, in other words, the accused's conduct must at least be a physical cause of the harmful result, *e.g.*, causing the death of another. Id.

Many crimes are made up of not only one, but of several "conduct elements," including not only an act or omission, but also some specific result of that act or omission, or some prescribed attendant circumstances, or perhaps both result and circumstances. See  WAYNE R. LAFAVE & AUSTIN W. SCOTT JR., SUBSTANTIVE CRIMINAL LAW § 3.4(d) (1986).  In other words, an offense may contain one or more of these conduct elements which, alone or in combination with the others, form the

---

[14]We acknowledge that, although supposedly a simplified approach to understanding culpability, element analysis has produced similar confusion and ambiguity as its counterpart, offense analysis.  Legal scholars recognize that to rectify such problems state legislators must initiate necessary revisions to current criminal codes to express each element as a separate word to negate confusion as to which conduct element the element references.  Until such a time, however, the courts are duty bound to separate the elements by interpretation.

overall behavior which the Legislature has intended to criminalize, and it is those essential conduct elements to which a culpable mental state must apply. Correspondingly, each culpability term is defined with respect to each of the three kinds of "conduct elements": conduct, circumstances, and result. MODEL PENAL CODE § 2.02. See also Tenn. Code Ann. § 39-11-302. For example, where a specific act is criminalized because of its very nature, a culpable mental state must apply to committing the act itself, *i.e.*, awareness of conduct. On the other hand, unspecified conduct which is criminalized because of the result requires culpability as to that result, *i.e.*, result of conduct. Finally, where otherwise innocent behavior is criminalized due to the circumstances under which it occurs, a culpable mental state is required as to those surrounding circumstances, *i.e.*, awareness of circumstances. In other words, the analysis of the applicable *mens rea* varies according to the conduct elements of the offense.

In the present offense, the applicable *mens rea* is "knowingly." Tenn. Code Ann. § 39-11-302(b) defines "knowing" as:

> [A] person who acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the persons conduct when the person is aware that the conduct is reasonably certain to cause the result.[15]

When a criminal statute requires a *mens rea* of knowingly, it may speak to conduct, or to circumstances, or to result, or to any combination thereof, but not necessarily to all three. WAYNE R. LAFAVE & AUSTIN W. SCOTT JR., SUBSTANTIVE CRIMINAL LAW § 3.4(d). In essence, three theories of "knowingly" exist, *i.e.*, (1) conduct; (2) circumstances; and (3) result of conduct, to correspond to the three conduct elements of a criminal offense. See Tenn. Code Ann. § 39-11-302. Since a crime may consist of more than one "conduct element," there may be different *mens rea*

---

[15]But see Tenn. Code Ann. § 39-11-302(a) (intentional refers to nature of conduct or result of conduct); Tenn. Code Ann. § 39-11-302(c) (reckless refers to circumstances or result of conduct).

requirements as to the different "conduct elements" that constitute the crime, even if the required culpability is the same, *e.g.* "knowingly."

Because the applicable definition of "knowing" is element specific, a blanket instruction as to each theory, generally, will invite error. In other words, the court cannot instruct the jury that it could employ either (1) conduct or (2) circumstances; or (3) result of conduct. To do so would effectively alter the State's burden of proving each element of the offense beyond a reasonable doubt. See State v. Lambert, 929 P.2d 846, 850 (Mont. 1996). For example, the offense of second degree murder is a result of conduct offense, that is, the intent of the legislature is to punish a person for the killing of another.[16] The trial court may only instruct the jury as to the result of conduct theory of knowingly. If the court instructed the jury as to "awareness of conduct" or "awareness of circumstances," the jury could find a defendant guilty on less proof than that needed to show that the defendant engaged in conduct with knowledge that his conduct is reasonably certain to cause the result. The dangers of a full instruction of the applicable *mens rea* diminishing the State's burden was illustrated in Alvarado v. State, 704 S.W.2d 36 (Tex. Crim. App.), reh'g denied, (1994), cert. denied, 514 U.S. 1112, 115 S.Ct. 1967 (1995), the same case that the appellant contends that this court is bound to follow, *infra*. In Alvarado, the defendant was charged with injury to her child by placing the child in a bathtub of scalding water. At trial, she defended on the ground that she did not know that the water was hot enough to cause burning, even though she admitted that she was angry at her child for resisting his bath and refusing to disrobe, and placed him, fully clothed, into the water, without first testing it. Id. at 39. The trial court provided a general instruction as to the applicable culpability requirement and refused to instruct on the result of the conduct definition. The appellate court reversed the defendant's conviction finding that the court's charge permitted the jury to convict the defendant if they found that she knowingly placed the child in "a tub of hot water"

---

[16]To determine which conduct element is applicable, one must simply look at the penal proscription and determine whether the Legislature intended to punish "specific conduct" as opposed to a "specific result." See Alvarado v. State, 704 S.W.2d 36, 39 (Tex. Crim. App.), reh'g denied, (1994), cert. denied, 514 U.S. 1112, 115 S.Ct. 1967 (1995).

31

without requiring a finding that she intended or knew serious bodily injury would result. Id. at 39-40.

The appellant argues that, because our criminal code is derived from the Texas adoption of the Model Penal Code,[17] the appellate courts of this state are necessarily bound to follow the same conclusion as reached by the appellate courts of Texas.[18] Specifically, she relies upon the decision of the Texas Court of Criminal Appeals, the court of last resort for criminal appeals, in Alvarado v. State, 704 S.W.2d at 36, which held that the trial court, in instructing the jury, must limit its charge of the applicable mental state to the "conduct element" or elements of the offense charged, because to provide a blanket charge as to the applicable culpability requirement would effectively alter the State's burden of proof. We concede that Texas and Tennessee have traveled similar paths regarding culpability requirements. Furthermore, while we acknowledge that Tennessee is now at the same crossroads previously confronted by the Texas court,[19] we decline to adopt the explicit holding in Alvarado as this holding may be distinguished under the circumstances of the case *sub judice*. Although we agree with the appellate court of Texas regarding the principal and theory behind element analysis, we decline to apply its holding of reversible error in the case now before us.

We agree with the appellant that to provide the jury with the option that the appellant was aware of her conduct, aware of the circumstances, or was reasonably

---

[17]See Derivation Comments, *Proposed Draft*, Tenn. Code Ann. § 39-403 (1973).

[18]The appellate court of Texas has adopted an element approach to culpability requirements. See, e.g., Patrick v. State, 906 S.W.2d 481, 492 (Tex. Crim. App.), reh'g denied, (1995), cert. denied, 517 U.S. 1106, 116 S.Ct. 1323 (1996); Hughes v. State, 897 S.W.2d 285, 296 (Tex. Crim. App.), reh'g denied, (1994), cert. denied, 514 U.S. 1112, 115 S.Ct. 1967 (1995); Cook v State, 884 S.W.2d 485, 487 (Tenn. Crim. App. 1994); Alvarado, 704 S.W.2d at 38.

[19]Acknowledging that the concept of "element analysis" in the Model Penal Code was foreign to the Texas courts, Judge Maloney, concurring with the majority's decision in Cook v. State, 884 S.W.2d at 492, recognized, "The initial drafters of the Penal Code attempted to adopt the 'element analysis' characteristic of the Model Penal Code. However, in removing two provisions key to the application of this analysis. . . the Legislature in effect tossed the Code into the air and allowed it to crash to the ground splintered and disjointed, leaving it to the courts to determine whether an element analysis or an offense analysis should be employed in its application."

32

aware that her conduct was reasonably certain to cause the result, is to relieve the State of their burden of proof. To prove that a defendant is aware of her conduct is one thing; to prove that the defendant's conduct is reasonably certain to produce a certain result is, although subtle, another. Alvarado, 704 S.W.2d at 39. Id. The court cannot give the jury the choice of which definition to apply to the crime charged, rather the statute defining the crime dictates which definition of "knowingly" is appropriate as to each element. See Lambert, 929 P.2d at 852 (Leaphart, J. concurring).

The appellant asserts that the offense of "aggravated child abuse," as defined in Tenn. Code Ann. § 39-15-402 and as charged in the present case, only contains the element of "result of conduct," as was determined in Alvarado. We do not agree. Upon analysis of our statutory provision, a purview into the legislative intent behind the enactment of the offense leads us to conclude that the offense, as charged in the case presently before this court, contains the elements of (1) awareness of conduct, (2) awareness of circumstances; and (3) result of conduct.

The trial court provided the jury with the following instruction:

**Any person who commits the offense of aggravated child abuse is guilty of a felony. For you to find the Defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements:**
**(1) The Defendant acted knowingly; AND**
**(2) That the Defendant did:**
**(a) Other than by accidental means, treat a child in such a manner as to inflict injury; OR**

**(b) Other than by accidental means, neglect a child so as to adversely affect the child's health and welfare; AND**

**(3) (a) The Defendant used a deadly weapon to accomplish the act of abuse; OR**
**(b) The act of abuse resulted in serious bodily injury to the child**

**The requirement of "knowingly" is also satisfied if it is shown that the Defendant acted intentionally.**

33



**A person acts "knowingly" if that person acts with an awareness either:**
> **(1) That his or her conduct is of a particular nature;**
> **or**
> **(2) That a particular circumstance exists.**

> **A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause a result.**

(Emphasis added). A reading of this instruction implies that, for a jury to find that the defendant acted knowingly, the jury must find that the defendant was (1) aware of her conduct or aware of the circumstances **and** (2) aware that the conduct was reasonably certain to cause a certain result as to each material element of the offense.[20] Although this instruction is erroneous in that it did not charge the specific *mens rea* definition applicable to each "conduct element," we conclude that any such error is harmless. Tenn. R. App. P. 36(a).

The prejudice in not providing a "conduct element" specific definition of the applicable *mens rea* is the alteration of the State's burden of proof. The instruction in the present case did not relieve the State's burden of proof. The jury was instructed that it must find <u>each element</u> of the offense beyond a reasonable doubt. The definition of "knowingly" provided by the court supplied a two-prong definition of the term, resulting in an added burden of proof upon the State, for which the appellant cannot now complain. Although the preferred instruction would be one that is "conduct element" specific, we conclude that the instruction provided in the present case did not prejudice the appellant. Accordingly, any such error in the instruction is harmless.

---

[20]The appellant also complains that, although the trial court provided the blanket instruction in its written charge, the court failed to instruct the jury as to the "result of conduct" element in its oral charge. Although the court did not verbally recite the "result of conduct" element of knowingly, the court did do so in the previous instruction for first degree murder. The court, in instructing the jury as to the definition of knowingly, remarked that this definition would be repetitious as it had been previously provided. We conclude that any error in the court's inadvertent omittance of the "result of conduct" element is harmless at best since it was provided elsewhere in the oral charge and it was provided in the written charge. Tenn. R. App. P. 36(b).

Because we have determined that the jury instruction constitutes harmless error, we must determine whether the evidence is sufficient to sustain the conviction. A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). It is the appellate court's duty to affirm the conviction if the evidence viewed under these standards was sufficient for any rational trier of fact to have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 317, 99 S.Ct. 2781, 2789 (1979); State v. Cazes, 875 S.W.2d 253, 259 (Tenn. 1994), cert. denied, -- U.S. --, 115 S.Ct. 743 (1995); Tenn. R. App. P. 13(e). On appeal, the State is entitled to the strongest legitimate view of the evidence and all legitimate or reasonable inferences which may be drawn therefrom. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992), cert. denied, 507 U.S. 954, 113 S.Ct. 1368 (1993).

Before a jury can find a defendant guilty of aggravated child abuse as charged in the present case, the State must prove beyond a reasonable doubt that the defendant "knowingly, other than by accidental means, treats a child under eighteen(18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare. . ." and such abuse results in serious bodily injury.[21] See Tenn. Code Ann. § 39-15-401; -402. "Knowing" is applicable to the situations in which the accused, while not having the actual intent to accomplish a specific wrongful purpose, is consciously aware of the existence of facts which makes his conduct unlawful. See People v. Weiss, 635 N.E.2d 635, 639 (Ill. App. 1994). "Knowing" is ordinarily established by

---

[21]"Serious bodily injury" is defined as bodily injury which involves:
(A) A substantial risk of death;
(B) Protracted unconsciousness;
(C) Extreme physical pain;
(D) Protracted or obvious disfigurement; or
(E) Protracted loss or substantial impairment of a function of a bodily member, organ or mental faculty.
Tenn. Code Ann. § 39-11-106(a)(33).

circumstantial evidence rather than by direct proof. People v. Hall, 652 N.E.2d 1266, 1269 (Ill. App.) perm. to appeal denied, (Ill. 1995). The undisputed proof reveals that the appellant strapped her two children, Dustin and Devin, into their car seats, secured the windows and doors, and left her children alone in the car for over nine hours, never returning to check on them. The children died as a result of systemic hyperthermia triggered by being locked in the hot vehicle. Obviously, by returning a guilty verdict, the jury did not accredit the appellant's theory of the case that the deaths of her children were an accident. Nor did the jury accredit defense testimony of the appellant's psychological problems. We conclude that a rational trier of fact could find that the appellant knew the ages of her children (circumstances), knowingly strapped her children in the car (conduct), knowingly neglected them over the next nine hours (conduct), and was aware that her conduct was reasonably certain to cause harm or injury to her children (result of conduct). Thus, the facts are sufficient to support a conviction for aggravated child abuse on each count. Tenn. R. App. P. 13(e). This issue is without merit.


### V. Prior Sexual Relationship with Micah Majors


The appellant contends that the trial court improperly permitted the prosecutor to elicit testimony from the State's witness, Micah Majors, regarding his prior sexual relationship with the appellant. Specifically, she contends that the evidence was inadmissible because it related to specific proof of character or trait, prohibited by Tenn. R. Evid. 404, and because it provided a "specific instance of conduct of a witness for the purpose of attacking or supporting the witness' credibility" by extrinsic evidence, prohibited by Tenn. R. Evid. 608. We find that these arguments are misplaced. As evidence of the nature of appellant's relationship with Majors was properly admitted to establish bias on behalf of Majors, we need not address the appellant's 404 and 608 concerns.

Rule 616, Tenn. R. Evid. permits a party to "offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness."[22] Bias is an important ground for impeachment of a witness and is an aid for the trier of fact in assessing the weight to be afforded the witness' testimony. See Advisory Commission Comments, Tenn. R. Evid. 616; State v. Reid, 882 S.W.2d 423, 427 (Tenn. Crim. App. 1987). Any relationship of a party to a witness which might influence the testimony of the witness is a proper subject of impeaching evidence. See State v. Williams, 827 S.W.2d 804, 808 (Tenn. Crim. App. 1991). Our courts have long since recognized that witnesses are often as much influenced in testifying by feelings of friendship or hostility to parties to the case as by direct pecuniary interest in the result of the trial, and for this reason, proof of the relations of the witness to the parties may be shown. See Williams, 827 S.W.2d at 808 (citing Creeping Bear v. State, 113 Tenn. 322, 87 S.W. 653 (1905)). See also State v. Lewis, 803 S.W.2d 260 (Tenn. Crim. App. 1990); State v. Horne, 652 S.W.2d 916 (Tenn. Crim. App. 1983)). It is a well established principle that bias or prejudice of a witness is always relevant regardless of whether the matter stems from a sexual relationship. Thus, the nature of the appellant's relationship with Mr. Majors was relevant to show bias. See Tenn. R. Evid. 401. Additionally, we cannot conclude that evidence of the nature of the appellant's relationship with Mr. Majors was more prejudicial than probative. See Tenn. R. Evid. 403. The jury was already aware of circumstances from which they could infer the nature of the relationship between the appellant and Majors. Accordingly, we conclude that this evidence was properly admitted by the trial court. This issue is without merit.

---

[22]Tenn. R. Evid. 607 permits impeachment of a witness by either party.

## VI. Prosecutorial Misconduct During Closing Argument

During closing argument by the State, the prosecutor made the following remarks:

> Then, when everyone left that room but Micah Majors, she had another opportunity to care for these children. If she was just going to talk to Micah Majors, she could have taken those children to the room. She had done that many times. I submit, ladies and gentlemen, that more went on in that room than just talk. Use your common sense. You know what they did.

The defense objected to this statement, but was overruled by the trial court. The appellant contends that the statements made by the prosecutor were clearly erroneous since he was arguing facts which were refuted by the evidence elicited at trial.

Our state courts have recognized that closing argument is a valuable privilege for both the State and the defense and, accordingly, have afforded wide latitude to counsel in presenting final argument to the jury. State v. Cribbs, 967 S.W.2d 773, 783 (Tenn. 1998); State v. Cauthern, 967 S.W.2d 726, 736 (Tenn. 1998). Notwithstanding, closing argument is subject to the discretion of the trial court, which will be affirmed on appeal absent an abuse thereof, see State v. Tate, No. 02C01-9605-CR-00164 (Tenn. Crim. App. at Jackson, Dec. 3, 1997) (citing State v. Sutton, 562 S.W.2d 820, 823 (Tenn. 1978)), and must be temperate, predicated on evidence introduced during the trial, and relevant to the issues being tried. Cauthern, 967 S.W.2d at 736. The bounds of proper argument largely depend upon the facts in evidence, the character of the trial, and the conduct of opposing counsel, State v. Townes, No. 02C01-9505-CC-00140 (Tenn. Crim. App. at Jackson, Nov. 19, 1996), perm. to appeal denied, (Tenn. Jul. 21, 1997) (citations omitted), and may address any relevant and proper subject.[23] See Tenn. R. Crim. P. 29.1(b).

---

[23]When counsel's argument goes beyond these guidelines, reversal is required if the impropriety "affected the verdict to the prejudice of the defendant." Cribbs, 967 S.W.2d at 783 (citing Harrington v. State, 385 S.W.2d 758, 759 (Tenn. 1965)). Critical factors in determining if prejudice exists include:

(1) the conduct complained of viewed in light of the facts and circumstances of

Moreover, both the prosecution and the defense must be allowed to argue not only the facts in evidence, but also any reasonable inferences therefrom. Tate, No. 02C01-9605-CR-00164 (citing Russell v. State, 532 S.W.2d 268, 271 (Tenn. 1976)); State v. Hall, No. 01C01-9311-CC-00409 (Tenn. Crim. App. at Nashville, Mar. 5, 1997), *as corrected*, (Mar. 20, 1997) (citing State v. Cone, 665 S.W.2d 87, 94 (Tenn.), cert. denied, 467 U.S. 1210, 104 S.Ct. 2400 (1984)).

Micah Majors admitted on direct examination by the State that he and the appellant had previously shared an intimate sexual relationship. However, he denied that he and the appellant had sexual intercourse on the date of the present offenses. No proof was introduced at trial to either confirm or dispel Mr. Majors' assertion. Thus, a reasonable inference could be made as to the nature of the appellant's visit to Majors' hotel room. Additionally, in its charge to the jury, the trial court informed the jury that closing argument does not constitute evidence. Regardless of the inference implied by the prosecutor's argument, the proof was more than sufficient to find the appellant guilty of aggravated child abuse as to both counts.

We conclude that the prosecutor's statement was within the scope of proper argument, *i.e.*, he made an arguable inference from the evidence presented at trial. See Townes, No. 02C01-9505-CC-00140 (citing Russell, 532 S.W.2d at 271). The appellant has not shown that the inference raised by the prosecutor during closing argument was so improper or inflammatory as to warrant reversal. Moreover, we cannot conclude that the trial court abused its discretion in admitting the statement.

the case;
(2) the curative measures undertaken by the court and the prosecution;
(3) the intent of the prosecutor in making the improper arguments;
(4) the cumulative effect of the improper conduct and any other error in the record; and
(5) the relative strength and weakness of the case.

Cribbs, 967 S.W.2d at 783 (citing State v. Bigbee, 885 S.W.2d 797, 809 (Tenn. 1994); State v. Buck, 670 S.W.2d 600, 609 (Tenn. 1984); Judge v. State, 539 S.W.2d 340, 344 (Tenn. Crim. App. 1976)).

Accordingly, this issue is without merit.

## VII. Prior Bad Acts

Prior to trial, defense counsel filed a motion in limine to suppress any evidence of the appellant's alleged bad character or prior misconduct. The trial court reserved resolution of the matter until it was raised at trial. At trial, the State offered proof of the testimony of two witnesses, Pam Rhea and Connie Medley, to testify as to prior incidents of misconduct by the appellant. The trial court, after conducting a proper 404(b) hearing, prohibited the proffered testimony of Rhea and Medley.

During cross-examination of the appellant, the prosecutor asked her whether there had been prior incidents during which she was "too busy or too distracted to properly care for [her] children." The appellant stated that there had been no prior incidents. The prosecutor then asked the appellant about an incident during which she left her two children with Pam Rhea for twenty-five hours. Defense counsel objected to the question, at which time, the prosecutor stated that the question was just for purposes of credibility. The trial court overruled the objection and permitted the question. The appellant responded that "she knew they were okay when they were with her. . . . I was . . . a little confused." She further denied the allegation that she had informed Ms. Rhea that her state of intoxication prevented her from picking up her children.

After the defense rested, the State sought to offer the testimony of three rebuttal witnesses, including Pam Rhea. The trial court sustained the appellant's objection as to two of the rebuttal witnesses, but permitted the State to present the testimony of Pam Rhea, restricting her testimony to attacking the credibility of the

appellant. Ms. Rhea testified that she cared for the appellant's two children from August 1994 until March 1995, during which time the appellant worked the second shift at Calsonic. The appellant would "drop [the children] off at two-thirty and was supposed to pick them up at one o'clock in the morning." Ms. Rhea stated that, although the appellant was terminated from her employment on February 20th, Ms. Rhea continued keeping her children. Specifically, Ms. Rhea recalled that, on March 22, the appellant dropped the children off at one o'clock in the morning and did not return for the children until two o'clock the following morning, a total of twenty-five hours. During her unexplained absence, the appellant never called Ms. Rhea to check on her children. When she finally returned to pick up her children, she told Ms. Rhea that "she had been out with some friends and needed to go somewhere and sober up before picking up the children." Following Ms. Rhea's testimony, the trial court gave the jury the following instruction:

> Ladies and gentlemen of the Jury, I have allowed this witness'
> testimony for a limited purpose only. You may consider her testimony
> to this extent only. It is for the purpose of testing the credibility or the
> believability of the defendant's testimony and for no other reason. You
> cannot consider it for the question of whether or not the defendant was
> disposed or not to commit the crime for which she, now, stands
> charged; only, however, for the limited purpose of testing the . . .
> defendant's credibility or believability.

The appellant now contends that the questioning of the appellant regarding the March babysitting incident was "inadmissible, totally irrelevant, and highly prejudicial." She further contends that the trial court erred by permitting the State to introduce the rebuttal testimony of Pamela Rhea regarding a specific instance of bad conduct by the appellant.

Generally, character evidence is not admissible for the purpose of proving that a person has acted in conformity with that character trait on a particular occasion. Tenn. R. Evid. 404(a). However, several exceptions to the general rule barring character evidence exist. Specifically, in a criminal case, if and when the accused places his or her "character in issue," the prosecution may cross-examine

41

the accused to show that the accused's character is not really good. Tenn. R. Evid. 404(a)(1); State v. Phipps, 883 S.W.2d 138, 153 (Tenn. Crim. App. 1994); NEIL COHEN ET AL.., TENNESSEE LAW OF EVIDENCE § 404.3 (3d ed. 1995). Specifically, the State may inquire as to specific instances of bad conduct by the accused, provided that the prosecutor has a good faith basis for believing that the appellant really committed the specific bad act and the specific bad act is relevant to the specific character trait testified to by the witness. See Tenn. R. Evid. 405(b); NEIL COHEN ET AL.., TENNESSEE LAW OF EVIDENCE § 404.3. However, the prosecutor's ability to show specific bad acts is limited to cross-examination. He may not put on extrinsic evidence (e.g. other witnesses) to prove that the specific acts took place, if the accused denied that they did. See NEIL COHEN ET AL., TENNESSEE LAW OF EVIDENCE § 405.3. Conversely, the defendant may not put on other witnesses to show that the specific act referred to by the prosecutor on cross-examination never took place.

Throughout the appellant's case-in-chief, defense counsel presented testimony which portrayed the appellant as an extremely loving and nurturing mother. Thus, "opening the door" for the prosecution to offer relevant character evidence to rebut the appellant's proof. Accordingly, the questioning of the appellant as to the events of March 1995 was proper. However, since the appellant denied the specific conduct of which she was asked on cross-examination, the State had to accept the answer that was given. Accordingly, the questioning of Ms. Rhea as to the same instance of conduct was improper because it was extrinsic evidence of a prior bad act. Nonetheless, we cannot conclude that the improper questioning of Ms. Rhea and her responses prejudiced the outcome of the trial. See Tenn. R. Evid. 403. Considering, specifically, the trial court's instruction that Ms. Rhea's testimony was only to be used in determining the appellant's credibility and, generally, the overwhelming evidence supporting the jury's guilty verdict as to each count of aggravated child abuse, we find that the error was harmless beyond any doubt. Tenn. R. App. P. 36(a). This issue is without merit.

## VIII. Cumulative Error

Next, the appellant contends that the combination of errors arising from the closing argument of the prosecution and testimony regarding prior bad acts constituted an improper "character assignation" of the appellant (issues V, VI, VII), resulting in cumulative error. As we have concluded that any error arising from the introduction of any character evidence, if any at all, is harmless, this issue is without merit.

## IX. Class A Sentence for Aggravated Child Abuse

In her final issue, the appellant contends that, because the trial court failed to instruct the jury as to the class A felony version of the offense of aggravated child abuse, *i.e.*, child is under six years of age, there is no conviction for the class A version of the offense. Rather, she argues, the jury could only have found her guilty of the class B version of aggravated child abuse because the trial court only instructed the jury that "a child means a person under eighteen years of age." Thus, she concludes that her class A sentences (eighteen years on each count) are unlawful. In support of her argument, the appellant asserts that the age of the child, provided in subsection (b), constitutes an element of the crime charged. Conversely, the State contends that the age requirement of § 39-15-402(b) is merely a punishment provision.

Our duty, as the reviewing court, is to look at the statute before us and determine what the legislature intended. See Smith, 893 S.W.2d at 917. To complete our task, we must look to the statute's language, its structure, the subject matter, and the context of the challenged provision. See National Gas Distribs. v. State, 804 S.W.2d 66, 67 (Tenn. 1991). At the time of the present offenses, the

statute defining aggravated child abuse provided:

> (a) A person is guilty of the offense of aggravated child abuse who commits the offense of child abuse as defined in § 39-15-401 and:
>> (1) The act of abuse results in serious bodily injury to the child; or
>> (2) A deadly weapon is used to accomplish the act of abuse.
>
> (b) A violation of this section is a Class B felony; *provided, that, if the abused child is six (6) years of age or less, the **penalty** is a Class A felony.*

Tenn. Code Ann. § 39-15-402 (emphasis added). Additionally, the Sentencing Commission Comments to this offense advise that "[a]ggravated child abuse is a class B felony; however, if the child is age 6 or less, the offense is punished as a Class A felony." Sentencing Commission Comments, Tenn. Code Ann. § 39-15-402 (emphasis added).

As recently recognized by the United States Supreme Court, there are "certain circumstances [under] which fundamental fairness would require that a particular fact be treated as an element of the offense . . ., but there are also cases in which fairness calls for defining a fact as a sentencing factor." Monge v. California, No. 97-6146 (U.S. June 26, 1998). In so holding, the Supreme Court refused to adopt an absolute rule that an "enhancement constitutes an element of the offense any time that it increases the maximum sentence to which a defendant is exposed." Monge, No. 97-6146 (citing Almendarez-Torres, 523 U.S. at ---, 118 S.Ct. at 1219 (1998)). Rather, the basic rule is that "[a] statutory provision is a penalty enhancer if its proof, while raising the felony level of an offense, is not necessarily required to secure a conviction." People v. Leske, No. 96SC693 (Colo. Apr. 13, 1998), reh'g denied, (May 18, 1998) (*for publication*) (citing Almendarez-Torres, 523 U.S. at --, 118 S.Ct. at 1229).

Guided by these principles, we conclude that, under the present circumstances, fundamental fairness requires that the fact be treated as a penalty

enhancer. Considering the structure and plain language of the statute and the accompanying Commission Comments, we cannot conclude that the legislature intended to create an additional element to the offense. By adding the "provided" clause in subsection (b), the legislature did not create an offense that requires proof of elements different from the offense proscribed under the preceding provisions of the statute. The offense proscribed by the "provided" clause is precisely the same offense that is proscribed by the main portion of the statute. The legislature merely authorized an enhanced punishment for those offenders who victimize a certain subclass, *i.e.*, children under six years of age, of those individuals, *i.e.*, persons under eighteen years of age, sought to be protected by criminalizing such abuse and/or neglect. See ,*e.g.*, Almendarez-Torres v. United States, 523 U.S. at --, 118 S.Ct. at 1219 (interpreting 8 U.S.C. § 1326(b)(2) as a penalty provision rather than an additional element); Chaine v. Commonwealth, 436 S.E.2d 187, 190 (Va. App. 1993), *affi'd on reh'g*, (Nov. 17, 1993) (clause setting forth age requirement in sodomy statute establishes penalty provision).

Additionally, in the present case, the appellant could have anticipated a sentence for a class A felony. Both counts of the indictment provided the appellant with notice of the age of the children. At trial, there was no factual dispute regarding the age of the two children. Although the trial court did not explicitly instruct the jury regarding subsection (b) of the offense, the court did instruct the jury that "the punishment for this offense is not less than fifteen years nor more than twenty-five years imprisonment," the sentencing range for a class A felony. See Tenn. Code Ann. § 40-35-112(a)(1) (1990). No objection was made to this charge. Cf. State v. Palmer, No. 01C01-9607-CR-00285 (Tenn. Crim. App. at Nashville, Nov. 20, 1997). In light of our interpretation that subsection (b) merely constitutes a punishment provision and considering the circumstances at trial, we cannot conclude that any error exists. The appellant's claim is without merit.

**Conclusion**

Finding no reversible error committed by the trial court, we affirm the appellant's convictions and sentences imposed for two counts of aggravated child abuse.

_____
DAVID G. HAYES, Judge

CONCUR:

_____
GARY R. WADE, Presiding Judge

_____
JERRY L. SMITH, Judge